UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**UNITED STATES OF AMERICA**

                               Case No. 25-cr-20614

vs.                            HON. LINDA V. PARKER

**SAIF ALSENAD,**

    **Defendant.**
_____/

### SENTENCING MEMORANDUM FOR SAIF ALSENAD

Defendant Saif Alsenad, by and through his undersigned counsel, hereby files his Sentencing Memorandum in the above-entitled case.

### I. INTRODUCTION AND BACKGROUND

Saif Alsenad ("Saif" or "Mr. Alsenad"), age 34, is to be sentenced on February 26, 2026, following his guilty plea to an Information charging him with one count of making a false statement or representation to an agency of the United States, in violation of 18 U.S.C. § 1001. He has no prior criminal history of any kind.

1

## A. Saif's Background

Saif grew up in Dearborn, Michigan with supportive parents Abed (father) and Huda (mother) and his two younger sisters, Sarah and Hadeel. (PSR ¶ 35).[1] Saif has always been extremely close with his family. *Id.* Saif described his childhood as "phenomenal" in his presentence interview. (PSR ¶ 36). Given his appraisal, it should come as no surprise that he scored a 0 out of 10 on the Probation Officer's Adverse Childhood Experiences ("ACE") assessment, meaning that he is at the lowest level of risk for negative behavioral and health outcomes. (PSR ¶ 35). Saif attended Fordham High School in Dearborn and during high school he and his family moved temporarily to Syria to care for Saif's aging grandmother. (PSR ¶ 39). While in Syria, Saif earned his high school diploma from the International American School of Syria. (PSR ¶ 51). After returning to the U.S., Saif obtained an Associates Degree in Criminal Justice from Henry Ford College, then studied at Madonna University where he obtained a Bachelor of Arts degree in Criminal Justice with a minor in psychology. (PSR ¶ 53).

When Saif was in his early 20's, his father began to physically deteriorate from the devastating disease ALS, which attacks the brain and spinal cord and almost always leads to death. (PSR ¶ 36). What Saif did not mention in his presentence

---

[1] Saif has a stepsister named Neda Kadri, though she does not live with Saif.

interview (but something discussed in many of the letters sent to the Court) was Saif's unselfish dedication to caring physically for his father as he was deteriorating, and his assuming the mantle of family leader to provide financial and emotional support to his mother and younger sisters when his father was no longer able to.

As the voluminous letters in support of Saif attest, his taking over for his ailing father was completely consistent with the way Saif operates, always looking out for others rather than prioritizing his own needs. The letters document that Saif's selflessness applies even to strangers in need, whom Saif has a long history of helping to feed and clothe through events he organized and led.

Saif's sister Sarah, now a medical doctor, offered this about Saif: "If I could describe him in three words, I would say he is ethical, hardworking and very caring. He is a family guy and has always been." (PSR ¶ 39). Sarah's sentiment about Saif's caring for others is echoed in the 50 plus letters addressed to the Court.

### B. **Saif's Dedication to Helping His Community**

From a young age, Saif has worked tirelessly in our district volunteering his efforts with the NAACP, Western Wayne Family Health Centers, Dearborn Education Foundation, Dearborn Area Chamber of Commerce and Christ Temple Church of Inkster (Operation Refuge). (PSR ¶ 54). His work was largely responsible for his being honored with the NAACP's Trailblazer Award in

3

November of 2023. (PSR ¶ 53). According to Wikipedia, this is an award presented by the NAACP to recognize a pioneering individual whose contributions have made an outstanding and unique impact, paving the way for other people of color to follow. It is important that the Court note that this award is not merely honorary or ceremonial. It is a clear signal that the NAACP, an institution dedicated to civil rights and justice, has formally recognized Saif's leadership, innovations, and transformative influence in his community.

Ahmad Chebbani, Chairman of the American Arab Chamber of Commerce, stated this in his letter to the Court:

> For more than a decade, our organization and community have had the privilege of knowing Saif as a committed servant of the community, a respected leader, and a voice of integrity and compassion. From a young age, Saif has consistently demonstrated a deep dedication to uplifting those around him. His involvement began through local high school clubs and youth initiatives where he took on leadership roles…He has organized charity events, food drives, and community service efforts that have provided meaningful support to families in need…He is someone who shows up, listens, and takes action…Our community is stronger because of his presence and contributions.

(**Exhibit A**, Chebbani Letter to the Court).

Barbara Farrah, President of the Lansing consulting firm GCSI, wrote, "Saif possesses kindness and compassion that is not found in many…He is the person that will always make sure everyone is doing alright…I may be jaded by serving a life

4

in the political arena, but people like Saif are few and far between." (**Exhibit B,** Farrah Letter to the Court).

Adding her voice to the chorus of others is longtime family friend Zahraa Al-Ghawalb, who discussed in her letter how she worked side-by-side with Saif distributing food boxes to families in need. Ms. Al-Ghawalb wrote, "One of the most defining qualities about Saif is how deeply he cares for his community, his family, and his friends. He is the person who is always checking in on others, asking what they need, and looking for ways to help…He does not help people for recognition or benefit; he does it from a sincere desire to see others safe, supported, and cared for." (**Exhibit C,** Al-Ghawalb Letter to the Court). Ms. Al-Ghawalb concluded her comments, "Saif is a devoted son and brother, a loyal friend, a community servant, and one of the finest people I have known in my life." *Id.*

Michigan State House Representative Jaime Thomas, who also worked with Saif, wrote: "What stands out most about Saif is his ability to bring people together—he works tirelessly to build bridges between political parties, faiths, and cultures, always with respect and understanding." (**Exhibit D,** State Representative Thompson Letter to the Court). Representative Thompson added, "In his role as a public servant, Saif was also remarkably responsive and dependable …His integrity, empathy, and willingness to serve others are qualities that define his character." *Id.*

5

University of Michigan (Dearborn) physics and astronomy Professor Abbas Ahmad wrote that Saif "shows up, checks in, and gives back, day in and day out. His reputation among peers is of a person who treats others like family, who invests in the success of others without seeking reward, and whose presence has helped build stronger, more connected neighborhoods." (**Exhibit E,** Professor Ahmad Letter to the Court).

This memorandum could continue another twenty pages with similar sentiments from the plethora of individuals who know Saif and have witnessed his deep devotion to helping others in his community. Instead, the Court and government counsel are directed to a video prepared by Marcus Miller, someone who met Saif through Saif's work in the community and who took the initiative to produce a video which Mr. Miller funded himself. The background of the video is explained by Mr. Miller in his letter to the court, attached as **Exhibit F**. In the letter, he states that the video's purpose is to provide a fuller picture of Saif from the point of view of some of the people who know him the best. You can watch the video by clicking on this link:

https://bullottalaw.app.box.com/s/5siifk73uxlx6vf3519vo1kmef8witho

### C. Saif's Career Path of Public Service

Saif's career choices have reflected his deep commitment to his community and to public service. Those choices have included working as a police officer for the Inkster Police Department where he was a crime scene investigator between 2016 and 2022 (PSR ¶ 62), working for the City of Inkster in the Mayor's Office between 2002 and 2023 (PSR ¶ 61), working for SMART as an Ombudsman of Government Affairs between 2023 and 2024, working as Director of Government and Public Affairs for the Wayne County Executive between 2024 and 2025, and working in his current position for the American Arab Chamber of Commerce in Dearborn.

With everything Saif does, whether it is helping his family and community or working in a chosen occupation, the touchtone has always been service to others. His career choices were not accidental. They align completely with the person and character of Saif Alsenad, someone who is always looking to help others in need.

## II. THE OFFENSE OF CONVICTION

It is important to acknowledge at the outset that Saif was not convicted of bribery or any iteration thereof. Instead, after thoughtful negotiations with the government, the crime of conviction is making a false or misleading statement to a government agency in violation of 18 U.S.C. § 1001. This followed at least five

7

separate proffers whereby Saif voluntarily presented himself to the government for extensive questioning by FBI agents and federal prosecutors.

### A. Facts Establishing the Section 1001 Violation

Saif's conviction at bar is based solely on his statements to FBI agents when they came to his home unannounced on the morning of October 7, 2024, and questioned him about his time working for Inkster Mayor Patrick Wimberly. As he admitted at his guilty plea hearing, Saif did not provide certain information he had concerning Wimberly and therefore misled FBI agents with his answers. Specifically, agents asked him if there was anything questionable about what he observed while working for Wimberly. Saif stated that he "never saw anything weird." In truth, Saif had witnessed practices that he considered unusual, including the request for money for the property in question.

### B. The Polygraph Examination

Prior to the resolution of this case, the government offered Saif an FBI-administered polygraph to determine whether Saif was telling the truth when he maintained that he was not aware of Wimberly's bribe scheme at the time it occurred. Specifically, Saif told the government that he understood that the $100,000 payment solicited from the purchaser of the City of Inkster property (who was an FBI

8

informant) was to benefit the City of Inkster, not Mayor Wimberly personally. Thus, Saif was unaware of the corrupt nature of the payments at the time they occurred.

Wanting to test his veracity, the government arranged for longtime FBI polygraph examiner and Special Agent Michael Fitzgerald to conduct a polygraph test of Saif on this point. However, Saif's previous counsel advised Saif to decline the government polygraph and Saif followed his counsel's advice.

Shortly after Saif retained undersigned counsel, a defense polygraph was arranged to test Saif's veracity on this issue. Saif submitted to an examination and was found to be truthful. Significantly, that polygraph test was performed by former Special Agent Michael Fitzgerald, the same polygraph examiner whom the government had selected to do the polygraph. It so happened that Agent Fitzgerald went on to retire from the FBI between the time the government first offered the polygraph to Saif and the time that undersigned counsel was retained and engaged former agent Fitzgerald to perform the polygraph for the defense.[2]

The questions in agent Fitzgerald's polygraph test of Saif focused narrowly on whether Saif knew that funds paid for the city-owned property in question were intended for the mayor personally rather than for the municipality. Saif was asked,

---

[2] Undesigned counsel had previously worked with Special Agent Fitzgerald while working in this district as an AUSA and knew well his excellent reputation.

9

"Did you know for certain that the payments for that land would personally benefit [Mayor] Wimberly?" Saif's answer was "No." Former agent Fitzgerald found Saif to be truthful on this point with no deception indicated. (**Exhibit G,** Polygraph Examination Report by Michael P. Fitzgerald dated May 28, 2025).

### 1. Law Regarding the Use of Polygraph Results at Sentencing

Historically, the Sixth Circuit has "generally disfavor[ed]" the admission of polygraph results **at trial**. *United States v. Thomas,* 167 F.3d 299, 308 (6th Cir. 1999). However, the "court has never adopted a *per se* prohibition of the introduction of polygraph evidence." *Id.* (citing *United States v. Odam,* 13 F.3d 949, 957 (6th Cir. 1994)). In post-*Daubert* decisions, the Sixth Circuit has cited the application of Rule 403 as the deciding factor to preclude polygraph results due to their tendency to unfairly prejudice a jury. *See, e.g., Thomas,* 167 F.3d at 308. Other courts, including the District of New Mexico, have held that polygraph results *can* be admissible at trial if they pass the Supreme Court's *Daubert* test and have indicia of reliability. *See United States v. Galbreth*, 908 F.Supp. 877, 891-896 (D. New Mexico 1995)(finding after exhaustive analysis that where the examiner was clearly competent and the polygraph test was properly conducted, that evidence satisfied *Daubert* and was admissible at trial).

At **sentencing**, however, the Rules of Evidence (including Fed. R. Evid. 403) do not apply. *United States v. Silverman*, 976 F.2d 1502, 1508-09 (6th Cir. 1992). In *Silverman,* the Sixth Circuit wrote, "We have acknowledged the wide discretion allowed a trial judge in considering the evidence submitted at sentencing." *Id.* at 1508. So long as evidence presented to the court "bears some indicia of reliability," it is appropriate for the court to consider it. *Id.* at 1511 (emphasis added).

> 2. **The Polygraph Results Bear Strong Indicia of Reliability and Should be Considered by the Court**

Here, the polygraph results have strong indicia of reliability. First, the polygraph examiner who performed the polygraph test was initially selected by the government to perform the test when the government offered it to Saif. This fact eliminates typical judicial concerns about "defense-selected" polygraph examiners. In addition, it is indisputable that former agent Fitzgerald is eminently qualified to conduct a polygraph examination given his vast experience testing defendants and others for the FBI.

When undersigned counsel reached out for a defense polygrapher, it just so happened that former agent Fitzgerald was familiar with the case since he had prepared to test Saif at the government's request while still employed by the FBI.

11

Former SA Fitzgerald conducted the polygraph test of Saif with the same methods and equipment he used when he was employed months earlier by the FBI.[3]

In addition, the polygraph results are consistent with Saif's long-maintained position that he lacked knowledge and corrupt intent. And the mere fact that Saif was willing to take a polygraph test with the same polygraph examiner whom the government had selected is corroborative of Saif's own belief in his lack of corrupt intent.

Moreover, his passing polygraph results are consistent with one key undisputed fact in this case: **Saif never received any money, nor was he present for any bribe payment by the FBI informant.** As a longtime former public corruption prosecutor, undersigned counsel is well-aware of the fact that individuals do not participate in bribery schemes without payment or sharing in the proceeds. There is no reason to believe, as the government suggests, that Saif is our district's first *pro*

---

[3] Undersigned counsel conferred with former SA Fitzgerald about the method he used to conduct the polygraph examination of defendant. SA Fitzgerald told counsel the following in an email: "I employed the Empirical Scoring System ("ESS"), the standard method taught to federal agencies at the National Center for Credibility Assessment ("NCCA"). Additionally, the [polygraph] charts were not only scored by me but were also peer-reviewed by [former FBI polygraph examiner] Brad Beyer to ensure accuracy and objectivity. For all criminal polygraph examinations, including the one conducted for [Mr. Alsenad], I use the Probable Lie Control Question Technique. This is the same method utilized by the FBI and is the preferred technique taught at the NCCA. The NCCA is the polygraph school located in Fort Jackson, South Carolina and is responsible for training all federal agencies that utilize polygraphs. My equipment is of the same type described in the case [of U.S. v. Galbreth, supra] and is identical to the equipment issued by the FBI. I utilize the Lafayette LX 6000, which monitors respiration, heart rate, and electrodermal activity. Furthermore, I use seat and foot sensors specifically designed to detect bodily movements that would indicate an attempt to employ countermeasures."

*bono* bribery conspirator.⁴ It is confounding why the government has chosen to ignore the polygraph test results from the very FBI polygrapher that they themselves chose to perform Saif's test.

In a further showing of Saif's good faith, after Saif passed former agent Fitzgerald's polygraph, Saif offered to take a second polygraph test, this one administered by the government's selected polygrapher (second selection, technically). The government flatly declined Saif's offer in an email without elaboration.

Finally, the Court should note that it was *after* the polygraph test was performed by former SA Fitzgerald (the results of which were shared with government counsel) that the government pivoted to resolve the case as a false statement offense rather than a bribery or bribery conspiracy offense.

While the Court need not treat the polygraph evidence here as dispositive, the circumstances provide substantial indicia of reliability such that the court should consider the polygraph results as well as Saif's decision to take the test as corroborative evidence of his good faith and lack of criminal intent. The test results are also consistent with the views of the numerous letter writers to the Court who

---

⁴ It should be noted that the bribe amount that the government informant agreed to pay Mayor Wimberly was $100,000, which was the same amount that the property was appraised at by City of Inkster's real estate agent, Stephanie Taylor. This is corroborative of Saif's belief that the $100,000 was intended for the City that appraised it.

13

view Saif as an extremely ethical and honest person who deeply cares about the wellbeing of others.

Attorney Mohamed Hammoud wrote the Court, "[Saif's] biggest flaw, if it can be called one, is that he cares too deeply. Unfortunately, it appears that some individuals have taken advantage of his trusting and generous nature." (**Exhibit H,** Hammoud Letter to the Court). It may be that former Mayor Wimberly was one of those people who took advantage of Saif's trusting nature.

### III. SENTENCING LAW AND ARGUMENT

#### A. Sentencing Procedure

According to the United States Supreme Court, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States,* 552 U.S. 38, 49 (2007). Moreover, "the Guidelines should be the starting point and the initial benchmark." *Id.* Then, after hearing the arguments of the parties, "the district judge should…consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Id.* at 49-50. Those sentencing factors include:

- Nature and circumstances of the offense
- History and characteristics of the defendant

- Need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense;

- Need to afford adequate deterrence to criminal conduct.

- Need to protect the public from further crimes of the defendant

- Need to avoid sentencing disparities among similarly situated defendants

18 U.S.C. § 3553(a).

### B. Sentencing Guidelines Calculations

The defendant agrees with the calculations contained in the Presentence Report, that is, Saif's final adjusted offense level with a criminal history category I is level 8. (PSR ¶ 28). Thus, he is a Zone A defendant with a guideline range of 0-6 months.

### C. Application of Section 3553 Factors

The mandate of Section 3553(a) requires at the outset, "The court shall impose a sentence **sufficient, but not greater than necessary**, to comply with the purposes set forth in paragraph (2) of this subsection [the sentencing factors]." 18 U.S.C. § 3553(a)(emphasis added). Those factors and their application are discussed below.

  1. **Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))**

As explained in more detail in Section II above, the crime was making a false or misleading statement to a federal agency. While it is a serious crime to mislead

15

the FBI, it is certainly on the lower end of the spectrum of crimes committed by defendants sentenced by this Court. Moreover, there is no reason to believe that Saif's statements to the FBI on October 7, 2024 significantly hampered its investigation of Patrick Wimberly, who has since been charged, convicted and sentenced. That is especially true since Saif went on to voluntarily participate in *five* separate debriefings with the government after the offense of conviction had occurred.

**2. History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))**

In 30-plus years of criminal practice as both a federal prosecutor and federal defense counsel, undersigned counsel has neither prosecuted nor represented anyone like Saif Alsenad. As the letters lay bare, Saif is one of the most caring and dedicated human beings in the Detroit metropolitan area, having amassed an incredible resume of volunteerism and public service that rivals the most committed community activists anywhere in our district. Saif is a truly unique human being in his level of caring for others and his selflessness. His long track-record of service and overwhelming praise from community leaders is both impressive and unimpeachable.

**3. Seriousness of the Offense, Promoting Respect for the Law, Providing Just Punishment (18 U.S.C. § 3553(a)(2)(A))**

Saif's crime is not one that needs any additional punishment apart from a felony conviction and a probationary sentence. While the offense of misleading the FBI is serious, the surrounding circumstances, including the fact that Saif lacked criminal intent, puts the offense in its proper context.

### 4. Providing Adequate Deterrence (18 U.S.C. § 3553(a)(2)(B))

Saif Alsenad does not need any further individual deterrent. He is convicted of a felony, something that is incongruent with every other aspect of his life. As he explained in the Miller video, the charges have caused him immense shame and embarrassment.

As for a general deterrent, other defendants committing this crime are very unlikely to have the same circumstances as the ones that existed for Saif. The fact that Saif is now a convicted felon is an adequate deterrent, especially given the surrounding circumstances here.

### 5. Protection of the Public from Further Crimes of the Defendant (18 U.S.C. § 3553(a)(2)(C))

There is no need for the Court to protect the public from Saif Alsenad. Saif poses no danger whatsoever. As close family friend Suhaib Al-Hanooti put it in his letter to the Court, "*Saif is not a threat to this community; he is a pillar within it*." (**Exhibit I,** Al-Hanooti Letter to the Court). Mr. Al-Hanooti explained, "Saif has been a leader and role model for individuals from diverse backgrounds, cultures,

17

faiths, and socioeconomic statuses. His continued presence in the community allows him to keep serving, mentoring, and uplifting others." *Id.*

### 6. Need to Avoid Sentencing Disparities Among Similarly Situated Defendants (18 U.S.C. § 3553(a)(6))

Because of the uniqueness of Saif's situation, it is difficult to find a case similar to his. Regardless, there is no reason to believe a probationary sentence on a false statement conviction for someone with no criminal history and with Saif's background would cause sentencing disparities nationally for this crime.[5]

## IV. CONCLUSION

It is axiomatic that one of the most reliable measures of a person's character is the quiet consensus of those who have seen that person's conduct over time, especially when no light was shining. The 50 plus letters provide the Court an overwhelming consensus on the issue of Saif's impeccable character. Abraham Lincoln said, "Reputation is the shadow. Character is the tree." This case undoubtedly cast a long and dark shadow on Saif. But the court is not sentencing that shadow; instead, it will sentence a young man whose character has been

---

[5] While the U.S. Sentencing Commission tracks sentencing data for federal offenses, it has not issued a specific, public report establishing a single nationwide average sentence for 18 U.S.C. § 1001.

observed, tested, and affirmed over decades by leaders in the community and by those who know him best.

Paster Jean Overman, First Vice President of the Western Wayne County NAACP and longtime mentor to Saif, wrote the Court, "It is difficult to put into words how much respect I have for [Saif]. Saif is a man of integrity and heart. He has made countless contributions to our community and has touched many lives along the way. I truly believe that his best work is still ahead of him, and that he will continue to use his gifts to uplift others." (**Exhibit J,** Overman Letter to the Court).

Because of the man Saif Alsenad has shown himself to be and the conduct underlying his conviction, undersigned counsel respectfully requests that the Court impose a one-year period of probation as punishment in this case.

          Respectfully submitted,

          /s/ *R. Michael Bullotta*
          R. MICHAEL BULLOTTA
          P85866/ CA 163401
          Bullotta Law PLLC
          615 Griswold St., Ste. 1620
          Detroit, MI 48226
          (313) 400-5775
          michael@bullottalaw.com

Dated: February 19, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2026, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send a copy of such filing to all the parties in this matter.

      /s/ *R. Michael Bullotta*
      R. MICHAEL BULLOTTA
      Counsel for Saif Alsenad